## Moritz *against* Garnhart.

A plaintiff *in loco parentis* may maintain an action on the case *per quod servitium amisit,* for an abduction of his daughter's illegitimate offspring.

ERROR to the common pleas of *Northumberland* county.

This was an action on the case by William Moritz against Baltzer Garnhart for the abduction of Rebecca M'Ewen *per quod servitium amisit.*

The fact was clearly proved that Rebecca M'Ewen was the illegitimate child of Louisa Moritz, the plaintiff's daughter; that it was then about ten years of age, and had lived in the family of its putative grandfather for five or six years, and was seduced away by the defendant.

After the plaintiff had proved these facts and closed his evidence, the court below instructed the jury that the plaintiff had not shown such title to the services of the child as entitled him to recovery in this suit, and directed the jury to find for the defendant.

*Merril,* for plaintiff in error, cited, 1 *Ashm.* 55; *Cowp.* 54; 8 *Johns.* 332; 6 *Mass. Rep.* 273; 10 *Mass. Rep.* 290; 11 *Mass. Rep.* 67.

*Jordan,* for defendant in error.

The opinion of the Court was delivered by

GIBSON, C. J.—The court thought the action could not be maintained on the relation of master and servant, unaided by that of parent and child, without proof of service by hiring. Such undoubtedly was the rule of the common law; and, in the case of an ordinary servant, such it is still. In the case of a child however, it is so far relaxed that employment in acts of service is equivalent to a state of servitude. The most frequent occasion for its operation thus mitigated

[Moritz v. Garnhart.]

is furnished by the action for seduction founded technically on the relation of master and servant, but requiring, by reason of the plaintiff's paternity, proof of no more than slight and desultory acts of service when the child had come of age. Yet a state of servitude, of some sort, must be established. And this relaxation has not been superinduced by the peculiar turpitude of seduction, the more readily to get at the punishment of it as a particular wrong; but it holds indifferently in cases of seduction, abduction and corporal injury, without regard to the sex. In an action for an assault on the plaintiff's infant son *per quod servitium amisit,* Lord Kenyon went the whole length of dispensing with proof of employment, and holding it sufficient for the action that he was living in the father's family and under his protection. Jones *v.* Brown, *Peake's N. P. C.* 233; S. C., 1 *Esp. N. P. C.* 217. If then the plaintiff in the case at bar were the putative father, there would be a sufficient implication of servitude from that alone to maintain the action. As the illegitimate offspring of his daughter however, he is not legally related to it; and whether he may have an action *in loco parentis* for the loss of its service is a question which occurs for the first time. Why may he not? Though a bastard be not looked upon as a child for any civil purpose, the ties of nature are regarded in respect to its maintenance. The putative father, though not legally related to it, is so far considered its natural guardian as to be entitled to the custody of it. In the King *v.* Cornforth, 2 *Stra.* 1162, the court granted an information for the abduction of a natural daughter from the protection of her putative father, thinking that a bastard is within the 4 and 5 Ph. & M., c. 8, which punishes the taking away of any maid or unmarried woman child from the possession of the father, mother, or person having the governance of it. Between the father and the mother however, the latter seems to have the prior claim; *Ex parte Knee,* 1 *N. R.* 148; for if the father obtain the custody surreptitiously, the king's bench will make him restore it. Rex *v.* Soper, 5 *T. R.* 278; S. P., Rex *v.* Mosely, 3 *East* 224, and Rex *v.* Hopkins, 7 *East* 579. Indeed it seems to have been doubted in Strangeways *v.* Robinson, 4 *Taunt.* 498, whether he has a right to the custody in any case. Yet in Rex *v.* Cornfoot, 1 *Boot's Poor Laws* 465, it was held that a putative father has a natural right to the care and education of his illegitimate child; and in Newland *v.* Osman, 1 *Boot's Poor Laws* 466, he was allowed to take it from the parish and maintain it. It may be safely said, then, that the law recognizes the rights of putative paternity for purposes of nurture and education. Here both father and mother had abandoned those rights; and shall they not be recognized in the person of the grandfather, so far as to induce a relaxation of the rule which ordinarily requires proof of service by hiring, in an action for the deprivation of it? He is indeed not a parent, but he is chargeable by the poor laws with the duty of one. The rights of a parent are pupillary; and as they are given for the benefit of the child, the person in the exercise of them must necessarily have a correlative

[Moritz v. Garnhart.]

remedy for their infraction. Independent of consanguinity, however, there is an interest which seems to be peculiarly his own, and proper for personal compensation. Who has not seen an adopted child become an object of as tender a solicitude as if it had issued from its fosterfather's loins; and can it be said that having bestowed his affection on it and reared it by his bounty, he yet shall not be permitted to exercise the rights of a father to it against an intermeddler? It would be a reproach to the law if he should not. But the stern simplicity of feudal principles is gradually bending to the more complicated relations of a milder civilization. So late as Barnham *v.* Dennis, *Cro. Eliz.* 770, a father had no remedy for the abduction of any of his children but the heir at law : at this day, by means of a servitude almost fictitious, power is put into his hands to redress almost every injury that may be done to them : and it seems to be a natural and a necessary step to put the same power into the hands of every one acting in a father's place. The defendant is a stranger in blood. He is father to the mother's husband; but it appears not that he acted by her authority; nor is it clear that she herself could have resumed it. After an abandonment of it for six years, she could reclaim it only through the order of a court, who would not lightly deprive the fosterfather of the expected fruit of his pains in the service and duty of the child. Here it is alleged, without proof, that its morals were endangered by the associations of the family ; but though that would be a ground of summary interference by the competent authority, it could operate here only in mitigation of damages. On the facts in evidence, the plaintiff had made out a case to recover.

Judgment reversed, and a *venire de novo* awarded.